Filed 5/12/22  P. v. Decker CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C091306 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE006173) |
| v. | |
| LONNIE RAY DECKER, | |
| Defendant and Appellant. | |

Defendant Lonnie Ray Decker was pulled over while driving a car registered to someone else that contained large quantities of methamphetamine and marijuana.  A jury found him guilty of transporting and possessing methamphetamine for sale, but hung on similar charges involving the marijuana.  He was sentenced to six years in state prison.

On appeal, defendant contends:  (1) a police officer, who was the prosecution's drug expert, violated his constitutional rights by improperly opining on his guilt when he was allowed to testify over defense counsel's objection that there was no way defendant could not have seen the methamphetamine on the floorboard of the back passenger seat;

1

(2) the same officer testified to inadmissible profile evidence in violation of his Sixth Amendment right to a fair trial; (3) that he received ineffective assistance of counsel when his trial attorney elicited testimony that one of the officers responding to the scene believed defendant was a white supremacist; and (4) that the matter must be remanded for resentencing given recent legislative amendments to Penal Code section 654.[1]

We agree the matter must be remanded for resentencing in light of the changes to section 654, but otherwise reject defendant's contentions on appeal.

## I. BACKGROUND

In October 2019, defendant was charged with possession of methamphetamine for sale (Health & Saf. Code, § 11378—count one), possession of marijuana for sale (Health & Saf. Code, § 11359, subd. (b)—count two), transportation of methamphetamine for sale (Health & Saf. Code, § 11379, subd. (a)—count three), transportation of marijuana for sale (Health & Saf. Code, § 11360, subd. (a)(3)—count four), possession of narcotics paraphernalia (Health & Saf. Code, § 11364—count five), and driving with a suspended license (Veh. Code, § 14601.1, subd. (a)—count six). It was further alleged that defendant had suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12), and had served four prior prison terms (§ 667.5, subd. (b)). The following evidence was adduced at trial.

On April 5, 2019, Elk Grove police officer Kenneth Welter responded to a call around 9:30 p.m. of a white BMW station wagon driving recklessly. He located the car stopped at a red light without its headlights on, which was a Vehicle Code violation. Based on the violation, Officer Welter initiated a traffic stop.

Defendant, the driver and sole occupant of the vehicle, eventually pulled over in a nearby residential neighborhood. Although defendant initially appeared to be under the

---

[1] Further undesignated statutory references are to the Penal Code.

influence of alcohol because he was mumbling and slurring his speech, a DUI investigation later determined that he was not. When defendant stepped out of the car, however, Officer Welter observed a plastic bag hanging from defendant's pocket that contained a green leafy substance the officer recognized as marijuana.

A records check revealed defendant's license was suspended and revoked, and the car he was driving had not been registered since 2017. Defendant was not the car's previously-registered owner.

Because the registrant lived several hours away, Officer Welter decided to have the vehicle towed. In accordance with department policy, officers conducted an inventory search before towing the car. The inside of the car was cluttered with trash, personal clothing items, and a sleeping bag and pillow. In the trunk area of the station wagon, there was a closed but untied trash bag with a plastic bag inside that contained a large clear bag with approximately two pounds of marijuana and four smaller containers or baggies of roughly 10 to 30 grams of marijuana each, plus one smaller baggie containing almost three grams of marijuana.[2]

The trash bag also contained clothing items and pants with a waist from 36 to 40 inches wide and length from 32 to 34 inches. A pink polka dot bag was lying on top of or next to the closed trash bag.

On the floorboard of the back passenger seat, officers found a gallon Ziplock bag that was tied off in the corner containing a white crystalline substance that was later identified as approximately 100 grams of methamphetamine.[3] In the front passenger seat, officers located a glasses case containing a glass methamphetamine pipe.

---

[2] The prosecution's drug expert testified that one gram was a useable amount of marijuana. Two pounds of marijuana cultivated outdoors ranged in value from $2,900 to $5,750; the same weight, if cultivated indoors, could be valued up to $10,000.

[3] Evidence showed a useable amount of methamphetamine was generally .1 grams.

After arresting defendant, officers located a $20 bill in his pants pocket that had a crystalline substance on it and also two bindles of another crystalline substance that were later determined to be about .55 grams and .64 grams of methamphetamine.

During the inventory search, no scales, money, packaging material, pay-owe sheets, or firearms or ammunition were found in the vehicle. Although officers found defendant's cell phone in the car, they did not search it.[4] No DNA samples or fingerprints were taken from the packaging in which the drugs were found.

Officer Greg Eisert, who responded to the scene and booked evidence, testified as the prosecution's expert in possession for sale of controlled substances. He testified that based on his training and experience, controlled substance sellers sometimes have pay-owe sheets, profit logs, and scales to weigh out drug quantities, but do not necessarily always possess such items in an attempt to avoid being charged as a seller if apprehended. It was common for both users and sellers to try to hide drugs on their person. Sellers often sold more than one type of drug, and users often used both methamphetamine and marijuana together.

Based on a hypothetical tracking the facts of the case, Officer Eisert opined that a person found in a car with two pounds of marijuana as well as five additional baggies of marijuana with specific quantities possessed the drugs for sale. He similarly opined that a person found in a car with a quarter pound of methamphetamine likely possessed the methamphetamine for sale rather than for personal use. His opinion was based primarily on the quantities of the drugs.

When asked why he did not swab any of the drug packages found in the car for DNA or fingerprints, Officer Eisert testified that given where they were located in the car, "there [was] no possible way he could not have known that they were in the car."

---

[4] The parties stipulated that police did not book defendant's cell phone into evidence.

Defense counsel objected based on speculation and that it was a question for the trier of fact, but the court overruled the objection and the answer stood. On re-cross, Officer Eisert clarified that he "imagine[d]" someone sitting in the driver's seat would be able to see the bag of methamphetamine on the floorboard of the rear passenger's seat.

Defendant testified on his own behalf. He admitted having prior felony convictions for grand theft of an automobile, assault with a firearm, 2 first degree burglaries, first degree kidnapping, and possession of a firearm, as well as a misdemeanor conviction for possessing fraudulent checks.

According to defendant, the day before he was arrested, he was in Modesto trying to get a new windshield and driver's side window installed in his truck. His friend, Kevin, was helping him obtain the new windows. The new windows took longer than anticipated, and defendant started to worry that he would not be able to use his truck to drive to Redding for a court appearance the next day, April 5. Defendant had driven Kevin, in Kevin's BMW, and dropped him off to get the windows for the truck.

While waiting for Kevin to return with his truck, he decided to drive Kevin's white BMW to Redding so he could make his April 5 court appearance. Defendant texted Kevin that he was taking his BMW, and he left for Redding, which was about a four hour drive, between 9:00 p.m. and 11:00 p.m. that night.

Defendant drove throughout the night and attended his court session in Redding the next day. He left Redding around noon and went to a truck stop in Anderson to take a shower and eat; he did not think he slept there. After about an hour or two, defendant got on Interstate 5 South to drive home. He felt tired during the drive and stopped several times because he started to fall asleep. In Arbuckle, he texted a friend whose name he did not remember to purchase two $40 bags of methamphetamine, which he believed was about a gram or a couple of grams. He intended to smoke one of the bags with the methamphetamine pipe he had with him so he would not fall asleep, but he only took a

5

little because people were around him. He had used methamphetamine for several years and usually smoked it a couple times a week.

Defendant testified that he had not seen a package of methamphetamine on the rear passenger floorboard when he dropped Kevin off to get the truck windows the previous day. He denied possessing the methamphetamine found on the rear passenger floorboard to sell it, claiming he did not know it was there, and he never intended to transport the methamphetamine for someone else to sell it.

Defendant only remembered seeing "stuff" in the back seat, but he could not tell what was back there except for a sleeping bag. He claimed he never looked in the back of the car, and he never opened the right rear passenger side door. According to defendant, a driver could not see the right rear passenger floorboard unless he stuck his head through the seats.

While the pink polka dot bag found in the back of the car was his, defendant testified he did not have anything else in the car besides what was on his person. After showering at the truck stop, defendant put his dirty clothes in the pink polka dot bag and threw it in the back of the car from the front seat.

Defendant admitted he knew there was marijuana in the car because Kevin told him "[his] weed [was] in the vehicle" when defendant left for Redding. Defendant, however, denied knowing about the large quantity of marijuana found in the trash bag in the back of the car. He just assumed that Kevin had a "bag of weed somewhere in the car," although he did not know where it was. Defendant also admitted having about a half ounce, or approximately 15 to 20 grams of marijuana, to personally use but not sell. He also was aware that there was some loose marijuana on the center console, which looked like it had been used as a tray to roll joints. He himself had used the center console to roll joints to smoke throughout the drive. He denied that Kevin asked him to sell the marijuana in the back of the car for him, or that Kevin had asked him to purchase it; he further denied transporting it for someone else to sell.

6

Defendant was six feet four inches tall and wore a size 44 pant in the waist, and a 36 or 38 inch length. He denied that the clothing found in the large trash bag was his.

During cross-examination, defendant testified that he did not know Kevin's last name and he did not know his address in Modesto. He admitted that he had grabbed the sleeping bag from the back seat to use as a pillow on the center console one time when he pulled over because he was falling asleep behind the wheel. He did not remember telling Officer Welter that he retrieved some things from the back seat area that morning, including a pillow and sleeping bag. He adamantly denied being able to see the rear passenger floorboard area from the driver's seat without having to put his head through the space between the front seats. He agreed that the quantity of methamphetamine and marijuana found in the car represented a significant monetary value.

On redirect, defense counsel played body camera footage captured by one of the Elk Grove police officers who responded to the scene. At one point after officers discovered the large bag of methamphetamine on the rear passenger floorboard, the video showed defendant admitting that he had gotten a couple of things out of the backseat, including a pillow and sleeping bag, but denying that he had seen the methamphetamine.

During closing, the prosecutor argued defendant was familiar with what methamphetamine looked like because he admitted using it, that the body camera video showed defendant telling the officer that he had in fact retrieved a pillow and sleeping bag from the back seat area, and that given his size, it was not likely that he had not seen the drugs in the back of the car. The prosecutor also questioned the credibility of defendant's story that Kevin, a "friend" whose last name and address he did not know, allowed him to take his unregistered car without proper plates and drive it to Redding with nearly $10,000 worth of drugs inside.

Defense counsel argued in closing that defendant was credible when he testified that he knew Kevin's marijuana was in the car, but he did not know how much or where it was located, and he was unaware of the methamphetamine on the rear passenger

7

floorboard.  She also argued that there was no evidence of normal indicia of sales, including scales, pay-owe sheets, multiple cell phones, guns, packaging, and money in various denominations.  Counsel suggested that the officers conducting the investigation were biased against defendant because they believed he was a white supremacist who Officer Eisert may have contacted while employed at another agency.

A jury found defendant guilty of counts one, three, five, and six.  The jury deadlocked on counts two and four, and the court declared a mistrial as to those counts and they were later dismissed.  In a subsequent proceeding, the trial court found the prior strike allegations true.[5]

After denying defendant's *Romero*[6] motion, the court sentenced defendant to six years in state prison as follows:  a three-year midterm on count three (transportation of methamphetamine for sale), doubled to six years for the strike prior, plus a concurrent 25 days in county jail on count five and a concurrent five days in county jail on count six.  The court imposed the midterm of two years for count one (possession of methamphetamine for sale) and stayed it under section 654.  The court imposed various fees and fines and awarded defendant 560 days of credit.  Defendant timely appealed.

## II.  DISCUSSION

A.    *Testimony Regarding Ability to See the Methamphetamine*

Defendant contends the trial court prejudicially erred by permitting Officer Eisert to testify over defendant's objection that he must have known the methamphetamine was on the rear passenger floorboard of the car.  In defendant's view, Officer Eisert's testimony constituted an improper opinion on his guilt and credibility, which violated his

---

[5]  In light of changes to section 667.5, subdivision (b), that went into effect before defendant was sentenced, the court granted the prosecutor's motion to dismiss all of the alleged prior prison term enhancements.

[6]  *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

Sixth Amendment right to a jury trial and his Fourteenth Amendment right to due process. He asserts that even though he testified after Officer Eisert, the officer's challenged trial testimony essentially labeled him untruthful, which likely tainted the jury's perception of his subsequent trial testimony.

### 1. Background

During redirect examination, the prosecutor asked Officer Eisert, the People's expert on possession for sale of controlled substances who had also responded to the scene the night defendant was arrested, why he had not taken DNA or fingerprint samples from the packaging of the drugs found in the car. Officer Eisert responded, "[bec]ause of where they were in the car, there is no possible way he could not have known that they were in the car." The court overruled defense counsel's objections that the testimony was speculative and an issue for the trier of fact.

On re-cross, defense counsel questioned the basis for Officer Eisert's statement that there was no way someone could not know the drugs were in the car since he did not participate in the actual search of the car. Officer Eisert responded that he had seen the methamphetamine on the rear floorboard when the rear passenger door was opened during the search, and again surmised that there was "no possible way that anybody driving that car with the belongings in that car could have not known that the methamphetamine was there. Same with the marijuana in the back." When counsel asked whether he was assuming that the person had opened the back door, the following exchange occurred:

"[OFFICER EISERT:] No. From the driver seat, it was sitting right there next to him on the back floorboard. You could see it from the driver seat. All you have to do is look right, it will be sitting right on the floorboard in plain view.

"[COUNSEL:] Your testimony is that you could see it from the driver seat?

"[OFFICER EISERT:] I would imagine so. It's sitting right there on the back floorboard in plain view.

9

"[COUNSEL:]  The back floorboard-passenger side, correct?

"[OFFICER EISERT:]  Yes.

"[COUNSEL:]  And that's your testimony is that you could see it from the driver seat?

"[OFFICER EISERT:]  I would imagine so.  I don't see how any other way that you could sit in that car and not know that that methamphetamine was there."

2.      *Analysis*

A trial court has broad discretion to determine the admissibility of evidence. (*People v. Williams* (1997) 16 Cal.4th 153, 196.)  On appeal, a trial court's decision to admit or exclude evidence is reviewed only for abuse of discretion.  (*Id.* at p. 197.)  A trial court's ruling that a question calls for speculation from a witness is also reviewed for abuse of discretion.  (*People v. Thornton* (2007) 41 Cal.4th 391, 429.)  The court's decision will not be disturbed unless there is a showing the "court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)  Applying the abuse of discretion standard of review here, we are satisfied the trial court did not abuse its discretion.

Under the applicable rules of evidence, a witness may testify to an opinion that is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of his testimony."  (Evid. Code, § 800.)  Although Officer Eisert was the prosecution's designated drug expert, the portion of his testimony defendant challenges here was based on his observations as a percipient witness after he responded to the scene and helped book evidence when defendant was arrested.  He observed the car and the location of the drugs in the car.  As the People argue, Officer Eisert's analysis of the scene and the proximity of the driver's seat to the bag of methamphetamine, was necessary to understand why he investigated the scene in the manner that he did, including not collecting fingerprint or DNA samples from the drug packaging.

10

While it is true that "[a] witness may not express an opinion on a defendant's guilt" because " 'the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt,' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77) we do not agree that Officer Eisert's testimony violated this long-standing principle as defendant argues. Instead, Officer Eisert offered his lay opinion on the ability to see the rear floorboard from the front driver's seat based on his personal observations when explaining what he did and did not do during his investigation.

*People v. Brown* (1981) 116 Cal.App.3d 820 and *People v. Torres* (1995) 33 Cal.App.4th 37, upon which defendant relies, are inapposite. In *Brown*, a non-percipient expert had already given the jury all the information it needed to decide the defendant had been acting like a drug runner, and thus there was no need for the expert to go further and opine the defendant *was* a drug runner. (*Brown, supra*, at pp. 828-829.) In *Torres*, a witness testified about his personal definitions of robbery and extortion, and then opined that a robbery was what had happened in that particular case. (*Torres, supra*, at p. 44.) The *Torres* court found the testimony improper because the court, rather than a witness, instructs the jury on the meaning of statutory terms or on what constitutes an offense. (*Id.* at pp. 45-46.)

Officer Eisert did not offer testimony similar to the witnesses in *Brown* and *Torres*. He did not opine that defendant was a drug seller nor did he offer his own definition of a what constitutes a crime or opine whether that definition had been satisfied under the particular circumstances of the case.

In any event, even if the trial court erred initially by overruling defense counsel's objections and admitting Officer Eisert's testimony that there was no way defendant could not have seen the methamphetamine on the rear floorboard, we conclude any alleged error was harmless. "Absent fundamental unfairness, state law error in admitting

11

evidence is subject to the traditional *Watson* test."[7] (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"]; *People v. Watson* (1956) 46 Cal.2d 818.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

During cross-examination Officer Eisert clarified he simply "imagine[d]" defendant would have been able to see the drugs and not that he was certain defendant actually saw the drugs. This latter testimony undermined his earlier statement that suggested he had the ability to see the methamphetamine given its location in the car, thus weakening any adverse effect of the challenged testimony on the jury.

Evidence also showed that defendant was aware of what methamphetamine looked like because he used the drug, and he agreed the large bag found in the back seat looked exactly like methamphetamine to him. Defendant also admitted that he had actually purchased methamphetamine while driving the car back from Redding, and the jury watched the body camera video in which defendant admitted that he had retrieved items from the backseat area where the large bag of methamphetamine was located. Defendant also admitted that he had suffered six prior felony convictions and one misdemeanor for

---

[7] We reject defendant's contention that the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 applies to this standard evidentiary error claim. Any alleged error in admitting Officer Eisert's statement did not so infuse the trial with unfairness as to deny defendant due process.

crimes of moral turpitude that the jury was instructed it could consider in judging his credibility. Given this evidence, and in light of defendant's numerous felony convictions that undermined his credibility, we conclude it is not reasonably probable that the jury would have reached a different outcome had Officer Eisert not testified that there was no way defendant could not know about the methamphetamine.

B.      *Profile Evidence*

Defendant contends the trial court erred by admitting Officer Eisert's expert testimony that the methamphetamine found in the car was possessed for sale. He argues this evidence was improper profile evidence that was both inadmissible and prejudicial, and that his trial counsel was ineffective for failing to object below.

1.      *Background*

Officer Eisert testified that while drug sellers often keep pay-owe sheets to document people who owe them money or drugs, and what quantities of drugs they have sold, not all drug sellers maintain written pay-owe sheets. Given advances in digital technology, like cell phones, drug sellers often store their drug sales activities in their phones. Drug scales are used to measure out quantities for buyers, but sometimes sellers premeasure the amounts so they are not caught with a scale. He opined that a person stopped with approximately two pounds of marijuana in his car, plus five additional smaller bags of marijuana in amounts ranging from 10 grams, 20 grams, and 30 grams, but no pay-owe sheets or a scale, likely possessed the drugs for sale. The predesignated bag amounts would make it easier, in his expert opinion, to exchange money for the drugs quickly to avoid detection. He also opined that a person stopped in the same car with a quarter pound of methamphetamine possessed the methamphetamine for sale. Officer Eisert further testified that in his experience, it was common for drug sellers to sell more than one type of drug, and that methamphetamine, a stimulant, and marijuana, which calmed someone down, were often used together.

13

On cross-examination, Officer Eisert conceded that many of the indicia of sales that he had encountered during his 17 years as an officer—scales, pay-owe sheets, cell phones, packaging, various denominations of money—were not found in defendant's car when he was pulled over. He also conceded that sometimes drug sellers keep firearms near the drugs they are selling, but that no firearm or ammunition were found in defendant's car.

### 2. Forfeiture

At the outset, defendant concedes he did not object to the challenged expert testimony as being improper profile evidence. The absence of an objection forfeits the issue on appeal.

Evidence Code section 353, subdivision (a) provides that a verdict or finding will not be set aside by reason of an erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." The California Supreme Court has " ' "consistently held that [a] 'defendant's failure to make a timely and specific objection' on the ground asserted on the appeal makes that ground not cognizable." ' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.) As a result, defendant has forfeited this claim of evidentiary error.

### 3. Ineffective Assistance of Counsel

Defendant next argues that his counsel was ineffective for failing to object to the alleged profile evidence. "A profile is a collection of conduct and characteristics commonly displayed by those who commit a certain crime." (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084.) In general, profile evidence is not admissible to prove guilt. (*Ibid.*)

To establish ineffective assistance of counsel, defendant must show, by a preponderance of the evidence, that his counsel's representation fell below the standard of a competent advocate and a reasonable probability exists that, but for counsel's errors,

14

the result would have been different.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)  Where " ' "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on direct appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

"[W]e begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' " (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)  Accordingly, defendant's burden is a " 'difficult' " one; we "will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*Ibid.*)  "Although deference is not abdication [citation], courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

A failure to object to evidence is generally not a profitable basis for challenging the competence of trial counsel.  (*People v. Kelly* (1992) 1 Cal.4th 495, 520 [failure to object to evidence is a matter of trial tactics as to which appellate courts generally do not exercise judicial hindsight].)  That settled principle compels us to reject defendant's contention here.

It is well-established that "an expert may testify concerning criminal modus operandi and may offer the opinion that evidence seized by the authorities is of a sort typically used in committing the type of crime charged.  An experienced police officer may testify as an expert, for example, that tools discovered in a defendant's automobile are of the type commonly used in burglaries. [Citation.]  A police inspector may explain that conduct such as that engaged in by the defendant constituted the ' "usual procedure" ' followed in committing the crime of 'till tapping.' " (*People v. Prince*

(2007) 40 Cal.4th 1179, 1223-1224.) "Such modus operandi evidence ' "helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior." ' [Citation.] Testimony concerning criminal modus operandi may be helpful to the jury even if the modus operandi is not particularly complex." (*Id.* at p. 1224.)

"In cases involving possession of [illegal drugs, such as] marijuana or heroin, experienced officers may give their opinion that the narcotics are held for purposes of sale based upon such matters as the quantity, packaging and normal use of an individual; on the basis of such testimony convictions of possession for purpose of sale have been upheld." (*People v. Newman* (1971) 5 Cal.3d 48, 53, disapproved on another ground in *People v. Daniels* (1975) 14 Cal.3d 857, 862.) "Courts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." (*United States v. Thomas* (6th Cir. 1996) 74 F.3d 676, 682, disapproved on another ground in *Morales v. American Honda Motor Co., Inc.* (6th Cir. 1998) 151 F.3d 500, 515.)

Defense counsel in this case reasonably could have determined that any objection based on profile grounds would have been futile, especially given the above authorities regarding the admissibility of modus operandi evidence concerning drug dealing. (See also *People v. Harris* (2000) 83 Cal.App.4th 371, 373 [officer's testimony that Atascadero State Hospital patients smuggle in contraband and barter it for postage stamps provided sufficient evidence defendant possessed marijuana and methamphetamine for sale]; *People v. Parra* (1999) 70 Cal.App.4th 222, 225-227 [sufficient evidence defendants possessed cocaine with the intent to sell based on officer's testimony regarding quantity, packaging, concealment behind car dashboard, lack of drug paraphernalia, and defendants not being under the influence]; *People v. Carter* (1997) 55 Cal.App.4th 1376, 1377 [trial court allowed officer "to render an expert opinion that defendant possessed rock cocaine for purposes of sale, based on the quantity of the drug

16

possessed"].)  "Counsel's failure to make a futile or unmeritorious objection is not deficient performance."  (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092.)

Officer Eisert, moreover, did not testify that drug sellers always act in a certain way, and defendant acted in that way, therefore defendant intended to sell the drugs found in the car.  Instead, he testified that: sometimes drug sellers have pay-owe sheet and scales, but sometimes they do not; sometimes they sell large quantities of drugs, but sometimes they sell small quantities of drugs; sometimes sellers use scales, but sometimes they do not; sometimes drug sellers have firearms, but sometimes they do not; street level sales are usually quick, but larger transactions are different; sellers commonly sell both methamphetamine and marijuana and buyers commonly use both methamphetamine and marijuana.  Counsel reasonably could have determined that such testimony did not constitute a typical "profile" for a drug dealer but instead helped aid the jury's understanding of drug dealing, with which the average citizen may not have experience.  She also reasonably could have concluded that Officer Eisert's testimony actually helped defendant because many of the items discussed such as pay-owe sheets, scales, and firearms were *not* found in the car he was driving, which tended to support his defense that he never intended to sell the drugs.

On this record, we cannot say defense counsel's failure to object to Officer Eisert's testimony had no rational purpose.  We therefore reject defendant's ineffective assistance of counsel claim.

C.      *Defense Counsel's Questions Regarding White Supremacy*

Defendant contends his trial counsel was ineffective because she unnecessarily elicited testimony from Officer Welter during cross-examination that he believed defendant was associated with white supremacy.  Defendant argues his counsel had no reasonable, tactical basis for eliciting the highly inflammatory testimony, which undermined his credibility and likely made the jury distrust and dislike him.  We disagree.

17

### 1. Background

During cross-examination, defense counsel asked Officer Welter if he believed defendant looked familiar when he had first contacted him in the car. He conceded that he had told a colleague defendant was "a white supremacist piece of shit" and that he was a "douche bag."

On redirect, the prosecutor asked Officer Welter if he had had contact with people who were white supremacists during his 14 years as a police officer. The court overruled defense counsel's relevancy objection after an unreported sidebar, and Officer Welton responded that he had. The prosecutor then asked if there was anything about the way defendant looked that made the officer believe he may, in fact, be a white supremacist. The officer responded that it was his bald head and multiple neck tattoos. His belief was also based in part on Officer Eisert's statement when he arrived on scene that he had a previous interaction with defendant while Officer Eisert worked at a different law enforcement agency.

On re-cross, Officer Welter conceded he did not know if defendant could grow hair on his head, and he acknowledged that he did not see any swastika tattoos on defendant's body. Officer Welter also admitted that he had no personal knowledge of defendant's supposed previous interaction with Officer Eisert to support his belief that defendant was a white supremacist.

### 2. Analysis

Defendant has failed to satisfy his heavy burden to establish ineffective assistance of counsel. (See *People v. Ledesma, supra*, 43 Cal.3d at pp. 216-218 [defendant must show, by a preponderance of the evidence, that his counsel's representation fell below the standard of a competent advocate and a reasonable probability exists that, but for counsel's errors, the result would have been different].) While we agree that evidence tending to show defendant harbored white supremacist views "carr[ied] with it the potential to evoke an emotional response against the defendant," (*People v. Young* (2019)

18

7 Cal.5th 905, 931) the record shows defense counsel had a sound tactical reason for eliciting the challenged testimony from Officer Welter during cross-examination.

Counsel reasonably could have believed that eliciting such testimony tended to show that the officers who conducted the investigation, including Officer Welter and Officer Eisert, were biased against defendant simply because they assumed he held repugnant beliefs. Such bias tended to undermine the credibility of Officer Eisert's testimony that defendant had to have seen the bag of methamphetamine on the rear passenger floorboard. As the jury was instructed with CALCRIM No. 105, in evaluating a witness' testimony, jurors could consider anything that reasonably tended to prove or disprove the truth or accuracy of the testimony, including whether the witness' testimony was influenced by a factor such as bias or prejudice. Thus, the record shows a rational tactical purpose for attempting to show the officers were biased against defendant, and we will not second-guess this difficult, tactical decision in the harsh light of hindsight. (*People v. Scott, supra*, 15 Cal.4th at p. 1212.)

Even if counsel's decision was arguably unreasonable, defendant cannot show prejudice. That is, he cannot show the outcome would have been different had counsel not elicited the white supremacy testimony from Officer Welter. Given the jury's verdicts, it is apparent the jury did not reject defendant's testimony in its entirety. Instead, some jurors apparently found credible defendant's testimony that the large bag of marijuana was his friend, Kevin's, and not his own since the jury hung on both marijuana charges. It simply rejected his denials regarding the methamphetamine since it found him guilty of both methamphetamine charges.

Given this outcome, there is no reasonable probability that the jurors' presumed negative reaction to defendant's alleged white supremacist beliefs affected their evaluation of defendant's testimony regarding the methamphetamine, but did not affect their evaluation of his testimony regarding the marijuana. Any concerns about the possible inflammatory impact of this type of evidence is thus alleviated by the jury's

19

verdicts, which did not completely reject defendant's credibility or testimony. Had the jury been unduly inflamed against defendant given the white supremacist evidence, it would have rejected his testimony outright, which the verdicts show it did not do.

D.    *Amendments to Section 654*

In supplemental briefing, the parties agree the matter must be remanded for resentencing given recent amendments to section 654. We concur.

Section 654, subdivision (a) prohibits a trial court from imposing multiple sentences for multiple convictions arising out of the same act. (*In re Wright* (1967) 65 Cal.2d 650, 653.) When defendant was sentenced in January 2020, section 654 required the trial court to impose the longest potential term of imprisonment for crimes arising from the same physical act and to stay the other, shorter terms.[8] (Former § 654, subd. (a); *People v. Corpening* (2016) 2 Cal.5th 307, 311; *People v. Sanchez* (2016) 245 Cal.App.4th 1409, 1415.)

While defendant's appeal was pending, Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1) went into effect on January 1, 2022. The bill amends section 654 to give a trial court discretion to choose what sentence to impose for convictions arising from the same act. The amended statute now provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Thus, a trial court is no longer compelled to impose the longest possible punishment for multiple convictions arising from the same act.

---

[8] Former section 654, subdivision (a) provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

In this case, defendant was convicted in count one of possession of methamphetamine for sale (Health & Saf. Code, § 11378) and in count three of transportation of methamphetamine for sale (Health & Saf. Code, § 11379, subd. (a)). The sentencing triad for count one is 16 months, or two or three years. (Health & Saf. Code, § 11378; § 1170, subd. (h).) The sentencing triad for count three is two, three, or four years. (Health & Saf. Code, § 11379, subd. (a).) Because count three had the longest possible sentence, the court was required to impose sentence on count three, and to impose and stay the sentence on count one under former section 654, which it did.

Under newly amended section 654, the trial court now has discretion to impose the sentence of either the possession count *or* the transportation count, which could result in the trial court imposing the shorter rather than the longer sentence. We thus conclude it is appropriate to remand the matter for resentencing. (See *In re Estrada* (1965) 63 Cal.2d 740, 744-745 [absent evidence of contrary legislative intent, ameliorative criminal statutes apply to all cases not final when the statute takes effect]; see also *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.)

## III.  DISPOSITION

Defendant's convictions are affirmed.  The matter is remanded for resentencing in light of Assembly Bill No. 518 (2021-2022 Reg. Sess.).  After resentencing, the clerk shall prepare an amended abstract of judgment and shall forward a copy thereof to the Department of Corrections and Rehabilitation.

/S/

_____

RENNER, J.

We concur:

/S/

_____

DUARTE, Acting P. J.

/S/

_____

KRAUSE, J.